OPINION
Terry Jennings, Justice
A jury found appellant, Keith Ladale Wilson, guilty of the offense of sexual assault, *892 [2] and it assessed his punishment at confinement for fourteen years. In five issues, appellant contends that the evidence is insufficient to support his conviction and the trial court erred in admitting extraneous-offense evidence and sustaining the State’s objections to certain portions of his trial counsel’s closing argument.
We affirm.
Background
The complainant testified that on May 28, 2010, when she was seventeen years old, she, her sister, and her friend, Kendall Alexander, drove to Livingston, Texas, to attend a party hosted by Caroline Hon. The complainant did not “have any intention of meeting a boy[,] ... spending any time with a boy,” or “finding a young man to make out with” at the party.
After arriving at Hon’s house, the complainant, her sister, and Alexander went out to dinner with Hon. They then returned to the house to “get[] ready’ for the party, and the complainant began drinking alcohol “around” 9:00 or 10:00 p.m. She explained that she did not “ha[ve] much experience with drinking alcohol” and could not remember how many drinks she had consumed that evening. She noted, however, that she “had a lot to drink,” “she continufed] to drink,” and “a lot of the night [was] kind of a blur” to her. At some point during the party, the complainant began to “feel unusual,” “drunk,” and “pretty intoxicated.” She remembered spending some time outside Hon’s house on the deck “drunk” and talking to her sister, Alexander, Hon, and Hon’s brother.
The complainant explained that the next thing that she remembered was being upstairs in the game room, where she awoke to “a bunch of commotion” and “yelling,” with “everyone freaking out.” She noted that her sister, who was in the game room with her, was “crying and yelling.” The complainant also noted that she was not wearing her pants or underwear, “still fe[It] intoxicated" and “drunk,” and was “having a hard time getting around.” She subsequently went to a hospital for a sexual-assault examination, and diming the examination, she continued to feel intoxicated.
The complainant further testified that she did not know appellant, had never met him before, did not see him the night of the party, and did not remember having any conversations with him at the party. She explained that she did not know how she “got up to the game room,” “who took [her] up there,” or “how long [she] w[as] up there.” And she did not remember taking her clothes off, appellant “coming into the [game room],” or appellant “engaging in sexual conduct with [her].” Finally, the complainant stated that she did not consent to having sexual intercourse with appellant, did not want to have sexual intercourse with him, and had she spoken to appellant at the party, she “would [have] remember[ed]” doing so.
The complainant’s sister testified that during the party, the complainant began “exhibiting some signs of intoxication.” And, while the complainant was intoxicated, she and appellant had a conversation. She noted that the complainant was “creeped out” by appellant, “got a weird vibe” from him, and was not interested in or attracted to him.
The complainant’s sister further explained that the complainant was not “experienced with alcohol” and did not “seem to be handling her alcohol very well” during the party. She was “drunk and tired,” had “slurred” and “slow[] speech,” and had “slower [motor] movements.” After *893 the complainant had become intoxicated “[v]ery quickly,” she stopped “making any sense” and could not properly form words and sentences. She also stopped “mov[ing] normally” and had lost her coordination. Because of this, it whs decided that the complainant should be taken “away from the party” to a “safer location” inside Hon’s house.
The complainant was originally placed on a couch in the living room downstairs. Because the complainant was making “noises” and erratic “arm movements,” and her sister believed that her level of intoxication was “severe” and “[e]xtreme,” she was moved upstairs to a couch in the game room, where she would be further away from the party. The complainant, who was not able to assist herself, had to be “lifted and carried” upstairs by her sister and others. According to her sister, the complainant had lost her physical coordination and did not appear to have any of her mental faculties. And the complainant did not respond when she was placed on the couch in the game room, was “[n]ot coherent at all,” and was not conscious. When she last checked on the complainant during the party, the complainant was “[n]ot moving, not coherent, [and remained] still.” And the complainant did not respond when her sister would enter the game room.
At some point later that evening, Robert James Austin, who had been staying at Hon’s house, tried to enter the game room, but the door was locked. The complainant’s sister, concerned by this, began “banging on the door.” Hon’s mother, Nancy Greer, was able to unlock the door, and when the door was opened, the complainant’s sister “saw [appellant] on top of [the complainant],” who was laying on the couch with her arm “dangling off,” “like, [it was] dead.” According to the complainant’s sister, appellant was “raping” and “having sexual intercourse with [the complainant],” who was unconscious, not moving, and not “participating] in any way” in the sexual intercourse.
When the complainant’s sister entered the game room, appellant, whose pants were around his ankles, “jumped off’ the complainant. When he did this, the complainant did not move, communicate, or respond. Her sister shook the complainant, who awoke after “a while.” However, after awakening, the complainant still could not form coherent sentences and did not appear to know what was happening.
The complainant’s sister subsequently called for emergency assistance, and she went to the hospital with the complainant. On the way to the hospital, the complainant still could not form sentences and did not appear to have her full physical capabilities. And even after they arrived at the hospital, the complainant still was not “fully aware of what [was] going on.”
Austin testified that at some point during the party at Hon’s house, he went upstairs to the game room, in which he had been staying, to retrieve his wallet and keys. When he entered, he saw the complainant “laying down on the couch,” “passed out,” and “asleep.” Austin noted that she “had her clothes on” and did not react to any noise that he made while he was in the game room.
Austin then left Hon’s house to go to a restaurant. When he returned, fifteen minutes later, he again went back upstairs to the game room to put his wallet and keys away, but found that the door to the game room was locked. Austin, noting that it was unusual for the game-room door to be locked, knocked on the door. After he received no response from the complainant, he went downstairs to tell the complainant’s sister about the locked door. Subsequently, Austin heard screaming and shouting, and he ran back upstairs to the *894 game room, where he found the complainant incoherent on the couch and her sister, Greer, and- appellant. Austin saw appellant pulling up his pants and that the complainant was not wearing any pants or underwear. He explained that even after the complainant started “coming to,” she “didn’t really know or comprehend what was going on,” and she asked “[w]hat [had] happened.”
Greer testified that during the party, she noticed that the complainant had become intoxicated and “had had too much to drink.” Later, the complainant’s sister came to get Greer to unlock the game-room door. When she and the complainant’s sister entered the game room, she saw the complainant “laying on the couch asleep[] and [appellant] was on top of her.” The complainant “was not moving" at all.” Greer explained that she saw the appellant’s “rear end,” which was not clothed, and he was engaging in sexual intercourse with the complainant, who was not clothed from the waist down, while she slept.
When Greer and the complainant’s sister walked into the room, appellant “got up.” Greer asked him, “What are you doing?” and he responded, “I don’t know. I don’t know.” After pulling up his underwear, appellant then ran out of the room. During this event, the complainant did not move at all, and' she was not conscious.
When Greer subsequently drove the complainant to the hospital, she did not “appear to have a good understanding of what had gone on” or “appear to comprehend the fact that she had just been sexually assaulted.” However, Greer further explained that the complainant did not appear to be intoxicated on the way to the hospital. Regardless, there'was no doubt in Greer’s mind that appellant “was sexually assaulting [the complainant] who was unconscious when [Greer] walked into the game room.” ' • ■
Hon testified that during the party she interacted with the complainant, saw her drinking, and noticed that she became suddenly intoxicated. The complainant began not “making sense” and “slurring” her words. Therefore, she, the complainant’s sister, and Austin placed the complainant on a couch in the living room downstairs. Subsequently, she and the complainant’s sister “carried” and “dragg[ed]” the complainant upstairs to the game room, “so [that] she could have her own room.” Hon explained that the complainant did not walk up the stairs on her own; rather she was “dead weight.” Once upstairs in the game room, they placed the complainant on the couch. Throughout this entire time, the complainant remained “unconscious.”
Later in the evening, Hon heard screaming and ran upstairs. As she ran, she encountered appellant running downstairs. When Hon reached the game room, she saw the complainant’s jeans and underwear on the floor and the complainant’s sister trying to awake the complainant, who was “unconscious” and laying “still” on the couch. On the way to the hospital, the complainant “was in and out of it” and “didn’t know what was going on.”
Alexander testified that during the party, the complainant became “pretty intoxicated” and “passed out” on the living-room couch. Alexander further explained that the complainant was “passed out drunk,” “basically unconscious,” and she did not think that she would “have been able to wake [the complainant] up if [she] had tried.” Thus, Hon and Alexander moved the- complainant upstairs to the game room.
Alexander then went outside, where she had a conversation with appellant. She and appellant had “a normal conversation *895 about life” and “talkfed] about relationships.” During this conversation, Alexander “mentioned” to appellant that her friend, the complainant, “had passed out inside [the house]” and “was upstairs.” After Greer and the complainant’s sister saw appellant engaging- in sexual intercourse with the complainant, Alexander spoke to her, noting that she was “distraught, confused, crying, [and] upset.” The complainant also did not appear to understand or comprehend what was happening, and according to Alexander, the complainant was not “looking to hook up with somebody” or “have sex with guys” at the party.
Cynthia Brittain, a medical laboratory technician at Memorial Medical 'Center Livingston (“MMCL”), testified that the complainant was admitted to the hospital on May 29, 2010. Brittain administered ari alcohol test on the complainant’s blood to determine its alcohol concentration, which was 0.11.
Sherry Keen, a sexual assault nurse examiner at MMCL, testified that she was trained to provide comprehensive care to sexual assault victims and collect forensic evidence. Keen performed a sexual-assault examination on the complainant.- Although the complainant could not give Keen “any details about the sexual assault, Keen found “scratches” 'and “multiple lacerations,”' which appeared to be “fresh,” around the complainant’s anus. Keen explained that such' trauma would be consistent with “someone scratching the anal region with fingernails as they were pulling underpants down from underneath a person that might be lying- [down].” And although Keen did not find trauma to the complainant’s vaginal region, this was consistent with -“somebody who was unconscious and not resisting [a] sexual assault.” Keen also collected forensic evidence from the complainant.
Camille Stafford, a forensic scientist-and technical supervisor with ■ the Texas Department of Public Safety (“TDPS”) Breath Alcohol Laboratory in Houston, testified that she tested- appellant’s blood, taken from him on May 29, 2010, to determine its alcohol concentration. Appellant’s blood had “less than 0.01 grams of alcohol per 100 milliliters of blood.” Stafford also converted the alcohol concentration -of the complainant’s blood, which had been determined by the hospital through testing serum, and'it--was “0.093 grams” of alcohol per 100 milliliters of blood.
Angelina Temple, a‘ forensic scientist with the TDPS Houston Regional Crime Lab, testified that she 'performed serology testing and' DNA analysis' in this case. She explained that the vaginal and anal swabs taken from the .complainant contained both appellant’s and the complainant’s DNA.
Appellant testified that he went- to the party at Hon’s house on May 28, 2010, drank alcohol, and'introduced himself to other guests.. He explained that he did not know the -complainant, her sister, or Alexander before the party, but saw them that night and introduced himself to them. Appellant had conversations with the complainant-and-Alexander, and he saw the complainant, her sister, -and Alexander drinking at the party.
At one point in the evening, appellant went swimming. Prior to swimming, he took off his jeans and shirt' in the game room, where he left them. Appellant swam for about “20 to 30 minutes,” and about an hour later, he went baek'upstairs to the game room “[t]o change out of [the] shorts that [he] had [been] swimming in.” In the game room, he found the complainant, alone, sitting 'on the couch, and he closed the door behind him. Prior to entering the room, however, appellant did not know that she was in the room.
*896 After appellant entered the game room, he had a conversation with the complainant, who had “woke up crying” and “sniffing,” with “tears running down her face.” When he asked her, “Are you okay? What is wrong?,” the complainant told him that “she had had problems with her boyfriend” and he “had just called [her].” He and the complainant then engaged in sexual intercourse. Appellant explained, “It wasn’t her saying, hey, let’s have sex. It was we sat and talked; and then, one thing lead to another.” According to appellant, the complainant consented to the sexual intercourse; she did not say “no” or “stop,” “yell out for help,” or “struggle.” And the complainant was “conscious when [appellant] w[as] in the [game] room with her.”
Appellant further testified that when the complainant’s sister and Greer came into the game room, he “g[o]t off’ of the complainant and “pulled up [his] underwear and ... shorts.” He then ran downstairs because he was “frightened” and “trying to get away from everything.”
On cross-examination, appellant admitted that he had previously told law enforcement officers that he had no recollection of what had happened in the game room. He also explained that he had “accident[ally]” locked the game-room door and did not respond to the people who were banging on the door. According to appellant, the complainant “fak[ed]” or “pretended to be unconscious” when the others came into the game room, but she was not unconscious when they engaged in sexual intercourse.
To rebut appellant’s testimony on the issues of intent and consent, the State presented evidence of an extraneous offense. Before admitting the extraneous-offense evidence, the trial court instructed the jury: “[Y]ou may only consider such evidence as evidence of intent or to refute the defensive theory of consent and you may not consider those other offenses, wrongs or acts, if any, for any other purpose.” [3]
The extraneous-offense witness then testified that on December 25, 2011, she engaged in a “text message conversation” with Josh Hooper regarding having “sex ... for money.” She explained that Hooper requested that she have sexual intercourse with him and appellant for money; however, she agreed only to have sexual intercourse with Hooper for $100. In his car, Hooper subsequently drove the witness to a wooded area, where he told her that they were “alone.” After Hooper gave the witness $50, she began performing “oral sex” on him in the front seat of the car. At some point, the witness thought she heard the sound of “something or somebody in the backseat moving around,” but she did not see anything.
Hooper and the witness then engaged in sexual intercourse, with him standing behind her outside of the car. The witness heard a “commotion” and “realize[d] that someone else had come [up] behind [her].” A second man then engaged in sexual intercourse with her. When the witness looked behind to see him, she saw that it was appellant. She then told appellant to stop, which he eventually did. Hooper then asked, “Where did [appellant] go? Where did he go?” The witness explained that, although she had consented to having sexual intercourse with Hooper, she did not consent to having sexual intercourse with appellant, whom she told to stop “numerous times.”
Jenny Smith,- a registered nurse at Memorial Medical Center, testified that she is a certified “SANE examiner” and performed a sexual-assault examination of the *897 extraneous-offense witness. During the examination, Smith found trauma, which was consistent with the witness’s description of an “aggressive” sexual assault with “[m]ultiple assailants.”
In -response to the rebuttal evidence, appellant testified that he was not with the extraneous-offense witness on December 25, 2011 and did not know anything about the incident.
Sufficiency of the Evidence
In his first issue, appellant argues that the evidence is insufficient to support his conviction because the State did not “prove beyond a reasonable doubt that [he] caused the penetration of the sexual organ of [the complainant] with his sexual organ, without her effective consent.”
We review the legal sufficiency of the evidence by considering all of the evidence “in the light most favorable to the prosecution” to determine whether any “rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact’s finding of the essential elements of the offense beyond a reasonable doubt. See Moreno v. State, 755 S.W.2d 866, 867 (Tex.Crim.App.1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. Williams v. State, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). However, our duty requires us to “ensure that the evidence presented actually supports a conclusion that the defendant committed”' the criminal offense of which he is accused. Id.
A person commits the offense of sexual assault if he, intentionally or knowingly, causes the penetration of the sexual organ of another person by any means, without that person’s consent. Tex. Penal Code Ann. § 22.011(a)(1)(A) ,. (Vernon 2011). A sexual assault is without consent if “the other person has not consented and the actor knows [that] the other person is unconscious or physically unable to resist” or “the other person has not corn sented and the actor knows [that] the other person is. unaware that the sexual .assault is occurring.” Id. § 22.011(b)(3), (5). Evidence that the complainant was unconscious due to voluntary intoxication is sufficient to prove lack of consent. See Elliott v. State, 858 S.W.2d 478, 485 (Tex.Crim.App.1993).
Here, appellant admits to having engaged in' sexual intercourse with the complainant, but disputes that he did so without her consent. Appellant asserts that the State did not establish that he “knew [the complainant] was unconscious or physically unable to resist, or that ... [he] knew [the complainant] was unaware that the sexual assault was occurring.”
The complainant testified that she began drinking alcohol “around” 9:00 or 10:00 p.m., “had a lot to drink,” and “continu[ed] to drink” throughout night of the party. And at a certain point, she began to “feel unusual,” “drunk,” and “pretty intoxicated.” When she later awoke in the game room, she was no longer wearing her pants and underwear, “still fe[lt] intoxicated” and “drunk,” and had difficulty moving around on her own. The complainant explained that she did not remember taking her clothes off, did not consent to having sexual intercourse with appellant, and did not want to have sexual intercourse with appellant. '
. Other witnesses, including the complainant’s sister, Greer, Hon, and Alexander, testified that during the party, the complainant drank alcohol, became intoxicated, *898 and did not “handlfe] her alcohol- very well.” According to these witnésses, the complainant was “drunk,” had “slurred” and “slow[ ] speech,” “slow[ ] [motor] movements,” could not properly form words or sentences, and was not “making any sense.” Her sister described the complainant’s level of intoxication as “severe” and “[e]xtreme.” And Greer testified that the complainant “had had too much to drink.”
At one point during the evening, Hon and the complainant’s sister carried the complainant upstairs to the game room and placed her on the couch. The complainant could not physically assist them in any way as she was carried and “draggfed]” up the stairs, and Hon described her as “dead weight.” At this time, the complainant was “[n]ot coherent at all,” was “unconscious,” and did not appear to have any of her mental faculties. When her sister checked on the complainant later in the evening, she was still “[n]ot moving, not coherent, [and remained] still.” Austin also testified that when he went into the game room to retrieve his belongings, he saw the complainant “laying down on the couch,” “passed out,” and “asleep.”
When the complainant’s sister and Greer found appellant on top of the complainant in the game room, the complainant was laying on the couch, with her arm “dangling off,” “like, [it was] dead.” As Greer explained, the complainant was “laying on the couch asleep[ ]” with appellant “on top of her.” The complainant, who was not wearing pants or underwear, “was. not moving at all,” not “participat[ing] in any way” in the sexual intercourse, and was unconscious. When appellant “jumped off’ the complainant, she remained still, did not communicate, and did not respond. Her sister had to shake the complainant to wake her up, which took “a while.” When Hon subsequently entered' the game room, the complainant was “still unconscious” on the couch.
Moreover, the complainant’s sister testified that earlier during the party, the complainant, while intoxicated, had a conversation with appellant, was “creeped out” by him, and “got a weird vibe” from him. And Alexander testified that when she spoke with appellant prior to the sexual assault, she specifically told him that the complainant “had passed out inside [the house]” and “was upstairs” in the game room.
Finally, Keen testified that when she examined the complainant, she found, around the complainant’s anus, “scratches” and “multiple lacerations,” which would be consistent with “someone scratching the anal region with fingernails as they were pulling underpants down from underneath a person that might be lying [down].” Keen also noted that the complainant had no trauma to her vaginal region, which was consistent with a situation where “somebody who was unconscious and not resisting [a] sexual assault.” Additionally, Stafford testified that the complainant’s blood had “0.093 grams” of alcohol per 100 milliliters.
Appellant argues that because only he and the complainant were in the game room at the time he had sexual intércourse with her, the ‘ complainant could not remember what happened, and he “specifically and unambiguously testified that he and [the complainant] engaged in consensual sexual intercourse,” the State could not prove her. lack of consent. However, the fact that the complainant did not remember the sexual assault is not disposi-tive of the issue of consent. See, e.g., Ray v. State, No. 03-13-00085-CR, 2014 WL 4362969, at *2-4 (Tex.App.—Austin Aug. 26, 2014, no pet.) (mem. op., not designated for publication) (holding evidence legally *899 sufficient to support sexual assault conviction where complainant “very intoxicated,” “passed out,” and awoke “naked from the waist down”); In re E.I.G., 346 S.W.3d 644, 645-47 (Tex.App.—El Paso 2009, no pet.) (holding evidence sufficient to support sexual assault conviction where complainant, who “was only wearing her-blouse” when she awoke, did not remember “if the male in the room with her did anything,” but “[ajppellantwas seen on top of an unconscious [complainant], and jumped off her when someone entered the room”); Everson v. State, No. 01-07-00510-CR, 2008 WL 2548843, at *3-6 (Tex.App.—Houston [1st Dist.] June 26, 2008, pet. refd) (mem. op., not designated for publication) (upholding sexual assault conviction where complainant “became voluntarily intoxicated by taking pills and passed out[][and] remained unconscious throughout the sexual intercourse”); see also Elliott, 858 S.W.2d at 485 (evidence complainant unconscious due to voluntary intoxication sufficient to prove lack of consent). And the complainant’s testimony that she did not consent to engaging in sexual intercourse with appellant is sufficient, by itself, to establish a lack of consent. See Everson, 2008 WL 2548843, at *4; Jensen v. State, 66 S.W.3d 528, 534 (Tex.App.—Houston [14th Dist.] 2002, pet. ref'd).
Further, from the evidence presented at trial, one reasonably could infer that appellant knew that the complainant was unconscious, physically unable to resist, or was unaware that he was engaging in sexual intercourse with her, and thus, also knew that she did not consent. See Hughes v. State, 194 S.W.3d 649, 654 (Tex.App—Tyler 2006, no pet.) (concluding jury could infer defendant knew he did not have complainant’s consent because he began sexually assaulting her while she slept); see also Jackson 443 U.S. at 319, 99 S.Ct. at 2789 (jury’s task to draw “reasonable inferences” from evidence).
Moreover, to the extent that there is any discrepancy between appellant’s testimony and the testimony of the complainant and the other witnesses, we note that the jury was the sole judge of the credibility of the witnesses at trial, and we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. Jackson, 443 U.S. at 319, 326, 99 S.Ct. at 2789, 2793; Williams, 235 S.W.3d at 750; see also Hernandez v. State, 804 S.W.2d 168, 170 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd) (“[T]he jury had the ability to observe the witnesses carefully, ... and -to evaluate the credibility of each witness and the overall sufficiency of the evidence on the issue of consent.”).
Viewing the evidence in the light most favorable to the jury’s vérdict, we conclude that it could have found beyond a reasonable doubt that the complainant did not consent to the penetration of her sexual organ by appellant. Accordingly, we hold that the evidence is sufficient to support appellant’s conviction.
We overrule appellant’s first issue.
Extraneous Offense Evidence
In his second issue, appellant argues that the trial court erred in “allowing the State, to present evidence of an extraneous sexual assault alleged to have been committed [by appellant] after the alleged sexual assault” of the complainant because such evidence was inadmissible and should have' been excluded.,
, We review a trial court’s ruling on the admissibility of extraneous offenses for an abuse of discretion. De La Paz v. State, 279 S.W.3d 336, 343-44 (Tex.Crim.App.2009). We will- not reverse a trial court’s *900 ruling '-on evidentiary matters unless the decision was outside the zone of reasonable disagreement. Winegarner v. State, 235 S.W.3d 787, 790 (Tex.Crim.App.2007). If the trial court’s ruling can be justified on any theory of law applicable to the ruling, the ruling will not be disturbed. De La Paz, 279 S.W.3d at 344. “When a trial court further decides not to exclude the evidence, finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice, this decision too shall be given deference.” Moses v. State, 105 S.W.3d 622, 627 (Tex.Crim.App.2003).
The admission of extraneous offenses to prove a person’s character or to show that the person acted in conformity with that character is prohibited. Tex. R. Evid. 404(b). Evidence of extraneous offenses may, however, be admissible to show “motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.” Id.; see also Montgomery v. State, 810 S.W.2d 372, 387 (Tex.Crim.App.1990). And evidence of extraneous acts may also be admissible to rebut defensive theories. Lane v. State, 933 S.W.2d 504, 519 (Tex.Crim.App.1996). Nevertheless, even when the admission of extraneous evidence is permissible under rule 404(b), such evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403; Blackwell v. State, 193 S.W.3d 1, 9 (Tex.App.—Houston [1st Dist.] 2006, pet. refd).
In addition to determining whether the trial court abused its discretion in admitting the extraneous-offense evidence, we must also engage in a harm analysis. See Tex.R.App. P. 44.2(b); Jabari v. State, 273 S.W.3d 745, 754 (Tex.App.—Houston [1st Dist.] 2008, no pet.), “Error in the admission of evidence is non-constitutional error,” and we disregard any non-constitutional error that does not affect a defendant’s substantial rights. See Tex. R. App. P. 44.2(b); Jaban 273 S.W,3d at 754; see also Barshaw v. State, 342 S.W.3d 91, 93 (Tex.Crim.App.2011). “A substantial right is affected when the error had a substantial and .injurious’ effect or influence in determining the jury’s verdict.” Jabari, 273 S.W.3d at 754 (citing Morales v. State, 32 S.W.3d 862, 867 (Tex.Crim.App.2000)); see also Tex. R. App. P. 44.2(b). We should not reverse a conviction for non-constitutional error.if, after examining the record as whole, we have “fair assurance that the error did not .influence the jury, or had but a slight effect.” Jabari, 273 S.W.3d at 754 (citing Johnson v. State, 967 S.W.2d 410, 417 (Tex.Crim.App.1998)).
In making'this determination, we consider the entire record, including- any testimony and physical evidence admitted for the jury’s consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. Haley v. State, 173 S.W.3d 510, 518 (Tex.Crim.App.2005); Motilla v. State, 78 S.W.3d 352, 355-56 (Tex.Crim.App.2002). The weight of evidence of the defendant’s guilt is also relevant in conducting the harm analysis under- rule 44.2(b). Neal v. State, 256 S.W.3d 264, 285 (Tex.Crim.App.2008); Motilla, 78 S.W.3d at 356-57; Kamen v. State, 305 S.W.3d 192, 197 (Tex.App.—Houston [1st Dist.] 2009, pet. ref'd). And we may consider the closing statements and voir dire, jury instructions, the State’s theory, any defensive theories, and whether the State emphasized the alleged error. Motilla, 78 S.W.3d at 355-56; Hankins v. State, 180 S.W.3d 177, 182 (Tex.App.—Austin 2005, pet. ref'd).
Here, we do not address whether the trial court erred in admitting the com *901 plained-of extraneous-offense evidence because even were we to conclude that the trial court erred in admitting such evidence, appellant, in his brief, does not argue that he was harmed by its admission. In order to assert an issue on appeal, an appellant’s “brief must contain a clear and concise argument for the contentions made,.with appropriate citations to authorities.” Tex. R. App. P. 38.1(i). And an appellant waives an issue on appeal if he does not adequately brief that issue, i.e., by presenting supporting arguments and authorities. See id; Cardenas v. State, 30 S.W.3d 384, 393 (Tex.Crim.App.2000). Because appellant has not adequately briefed his extraneous-offense issue by identifying the harm that he suffered as a result of the admission of the complained-of evidence, we hold that he has waived the issue. See Cardenas, 30 S.W.3d at 393 (holding issue inadequately briefed where “appellant d[id] not address the question of whether the alleged error ... was harmless”); see also Sierra v. State, 157 S.W.3d 52, 64 (Tex.App.—Fort Worth 2004) (holding issue of whether testimony was unfairly prejudicial under rule 403 inadequately briefed where “appellant failed to show how he was harmed by the testimony”), aff'd, 218 S.W.3d 85 (Tex.Crim.App.2007); Allison v. State, Nos. 01-01-00383-CR, 01-01-00384-CR, 01-01-00385-CR, 01-01-00386-CR, 2002 WL 31388717, at *3 (Tex.App.—Houston [1st Dist.] Oct. 24, 2002, pet. refd) (not designated for publication) (determining defendant waived complaint where brief “offer[ed] no further analysis, legal authorities, or record references ... to explain how he was harmed by the alleged error”); Fremin v. State, No. 14-01-00571-CR, 2002 WL 1315912, at *3 (Tex.App.—Houston [14th Dist.] June 6, 2002, no pet.) (not designated for publication) (concluding issue of whether extraneous act erroneously admitted waived, where “appellant’s brief identified] no evidence of harm”).
We overrule appellant’s second issue.
Closing Argument
In his third and fourth issues, appellant argues that the trial court erred in “sustaining [the] objections] by the State to [his] [closing] argument ... regarding [the] testimony of [Lieutenant Ken Boh-nert” and Austin because his trial counsel’s argument “was an accurate summary of th[eir] testimony.”
The following exchange took place during appellant’s closing argument:
[Appellant’s Trial Counsel]: Lieutenant Bohnert testified that Nancy Greer told him in. a statement in June that she didn’t think — that she did not think that [the complainant] was intoxicated.
[The State]: I’m going to object, Your Honor. That’s a misstatement of the 'evidence.
The Court: Sustained. ■
[Appellant’s Trial Counsel]: It’s—
The Court: I sustained the objection.
[Appellant’s Trial Counsel]: Lieutenant Bohnert testified that she — that Nancy Greer said that she thought [the complainant] was asleep. She thought [the complainant] had been doing something that day.
And Robert James Austin testified that when he saw [the complainant] that night, she was not intoxicated.
[The State]: I’m going to object. That’s a misstatement of the evidence.
[Appellant’s Trial Counsel]: Your Hon- or, that’s a flat-out statement of the evidence. If the jury heard it differently, they can consider it.
The Court: I sustain the objection and ask you to stick to the record.
*902 Appellant asserts that the above statements of his counsel constituted “an accurate summary of [Lieutenant Bohnert’s and Austin’s] testimony.” In response, the State asserts that any error by the trial court in sustaining its objections to the above argument was harmless.
A trial court has broad discretion in controlling the scope of closing argument, but it may not prevent defense counsel from making a point essential to ,the defense. Lemos v. State, 130 S.W.3d 888, 892 (Tex.App.—El Paso 2004, no pet.). A defendant has the legal right to argue any theory supported by the evidence, and all inferences from the evidence that are legal, fair, and legitimate may be argued by the defense. Lemos, 130 S.W.3d at 892; Melendez v. State, 4 S.W.3d 437, 442 (Tex.App.—Houston [1st Dist] 1999, no pet.), overruled on other grounds by Small v. State, 23 S.W.3d 549 (Tex.App.—Houston [1st Dist.] 2000, pet. ref'd). Prohibiting counsel from making a particular jury argument constitutes a denial of the defendant’s right to counsel when that argument is one the defendant is entitled to make. Riles v. State, 595 S.W.2d 858, 861 (Tex.Crim.App.1980); Lemos, 130 S.W.3d at 892.
Assuming, without deciding, that the trial court erred in sustaining the State’s objections noted above, we must determine whether the error was harmful.- See 'Tex. R. App. P. 44.2(a). Denial of the right to counsel is an error of constitutional magnitude. See U.S. Const, amend. VI; Tex. Const, art. I, § 10; United States v. DeLoach, 504 F.2d 185, 189-90 (D.C.Cir.1974) (holding restrictions on defendant’s closing argument violated constitutional right to counsel). Accordingly, because any error by the trial court in sustaining the State’s objections would be constitutional, we must determine whether the trial court’s actions were harmless beyond a reasonable doubt. Tex. R. App. P. 44.2(a); see also Williams v. State, 958 S.W.2d 186, 194 (Tex.Crim.App.1997); Cantu v. State, 395 S.W.3d 202, 210-11 (Tex.App.-Houston [1st Dist.] 2012, pet. ref'd). -In applying the “harmless -error” test, the primary question is whether there is a “reasonable . possibility” that the error might have contributed to the conviction. Mosley v. State, 983 S.W.2d 249, 259 (Tex.Crim.App.1998).
We note that our harmless error analysis does not focus on the propriety of the outcome of the trial, but instead, we “calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence.” Wesbrook v. State, 29 S.W.3d 103, 119 (Tex.Crim.App.2000). We are required to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution. Cantu, 395 S.W.3d at 211. We consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error. Snowden v. State, 353 S.W.3d 815, 822 (Tex.Crim.App.2011); Cantu, 395 S.W.3d at 211. However, these factors are not exclusive; other considerations may logically inform our harm analysis. Cantu, 395 S.W.3d at 211. As the Texas Court of Criminal Appeals has emphasized: “At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether ‘beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.’ ” Snowden, 353 S.W.3d at 822 (alteration in original).
Here, the State made its objections after appellant’s trial counsél made his argument to the jury regarding the *903 testimony of Lieutenant Bohnert and Austin. And the trial court merely sustained the State’s objections; it did not instruct the jury to disregard the argument. See Requeno-Portillo v. State, No. 01-10-00242-CR, 2011 WL 3820747, at *4-5 (Tex.App.—Houston [1st Dist.] Aug. 25, 2011, pet. ref'd) (mem. op., not designated for publication) (holding error in sustaining objection to defense counsel’s argument 'harmless where objection not made until after counsel had already made argument to jury and trial court did not instruct jury to disregard); Wiltz v. State, 827 S.W.2d 372, 373-74 (Tex.App.—Houston [1st Dist.] 1992) (same), rev’d oni other grounds, 863 S.W.2d 463 (Tex.Crim.App.1993); see also Rische v. State, 746 S.W.2d 287, 291 (Tex. App. — Houston [1st Dist.] 1988, no pet.) (noting court did not instruct jury to disregard defense argument). Accordingly, we hold that any error committed by the trial court in sustaining the State’s objections-to the pertinent portions of' the closing argument of appellant’s trial counsel was harmless.
We overrule appellant’s third and fourth issues.
Comment on the Weight of the Evidence
In his fifth issue, appellant argues that the trial court erred in “directing ... [appellant’s trial counsel] to ‘stick to the record ’ during [closing] argument” because, by doing so, the trial court “suggested to the jury” that appellant “had not ... been sticking to the record” and “was engaging in deceit.” (Emphasis added.) In response, the State argues that appellant “failed to preserve this point of error for review” because he “never objected that [the trial court’s] comment was an improper comment on the weight of the evidence.”
In ruling upon the admissibility of evidence, the judge shall, not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether. or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict,make any remark calculated to convey .to the jury his opinion of the case.
Tex. Code CRIm. PROC. Ann. art. 38.05 (Vernon 1979). “To reverse a judgment on the ground of improper conduct or comments of the judge, we must find (1) that judicial impropriety was in fact committed, and (2) probable prejudice to the complaining'party.” Dockstader v. State, 233 S.W.3d 98, 108 (Tex.App.—Houston [14th Dist.] 2007, pet. ref'd).
Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial. See Tex. R. App. P. 33.1(a); Unkart v. State, 400 S.W.3d 94, 98 (Tex.Crim.App.2013). When no objection is made, “remarks and conduct of the court may not be subsequently challenged unless they are fundamentally erroneous,” i.e., the error creates egregious harm. See Moreno v. State, 900 S.W.2d 357, 359 (Tex.App.—Texarkana 1995, no pet.); see also Powell v. State, 252 S.W.3d 742, 744 (Tex.App.—Houston [14th Dist.] 2008, no pet.). A trial court’s' comments do not constitute fundamental error unless they rise to “such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury.” Jasper v. State, 61 S.W.3d 413, 421 (Tex.Crim.App.2001) (trial court’s comments correcting defense counsel’s misrepresentation of previously admitted testimony, showing irritation at defense attorney, and clearing up point of confusion not fundamental error).
Here, appellant complains that during his closing argument, the trial court, in regard to the State’s objection that he was “misstating]” the 'evidence, *904 remarked: “I sustain the objection and ask you to stick to the record.” (Emphasis added.) Notably though, appellant did not object to this statement by the trial court. See Tex. R. App. P. 33.1(a). Further, appellant does not argue, nor can we reasonably conclude, that the trial court’s request that appellant’s trial counsel “stick to the record” constitutes fundamental error, which would negate the need for an objection. See Goforth v. State, No. 03-02-00487-CR, 2003 WL 21354498, at *5-6 (Tex.App.—Austin June 12, 2003, no pet.) (mem. op., not designated for publication) (holding trial court’s instruction to defendant to “[sjtick within the evidence that has been presented, during [his] argument” “not a comment on the weight of the evidence, nor did [it] result in a benefit to the State or prejudice or harm appellant’s right to a fair and impartial trial”); see also Jasper, 61 S.W.3d at 421 (“[A] tidal judge’s irritation at the defense attorney does not translate to an indication as to the judge’s views about the defendant’s guilt or innocence.”); Tate v. State, No. 01-13-00290-CR, 2014 WL 1678811, at *6-7 (Tex.App.—Houston [1st Dist.] Apr. 24, 2014, pet. ref'd) (mem. op., not designated for publication) (trial court’s expression of irritation with defense counsel not fundamental error). We overrule appellant’s fifth issue.
Conclusion
We affirm the judgment of the trial court.
Justice Huddle, concurring.

. See Tex. Penal Code Ann. § 22.013(a)(1)(A) (Vernon 2011).

. The trial court gave the jury the same instruction in its charge.